United States District Court
Southern District of Texas
**ENTERED**
December 29, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIM. ACTION NO. 5:15-CR-294-1 |
| | § | |
| LAURA ZAVALA | § | |

## REPORT AND RECOMMENDATIONS OF
## THE UNITED STATES MAGISTRATE JUDGE

On December 14, 2020, the Undersigned held a revocation hearing ("Hrg.") on the U.S. Probation Office's Petition for Warrant or Summons for Offender Under Supervision and Supplemental Petition for Warrant or Summons for offender Under Supervision. (Dkt. Nos. 109 and 128). The Government was represented by Assistant United States Attorney Michael Makens. Defendant, Laura Zavala, was represented by Christina Arellano Villareal.

Both Defendant and counsel appeared by video conference. Under the applicable Southern District of Texas General Orders, CARES Act Authorization for Video and Audio Conferencing in Criminal Proceedings and Order on Written Waivers of Personal Appearance Under the CARES Act, Defendant could not be physically present without seriously jeopardizing public health and safety during the national emergency created by the novel coronavirus. The hearing was not postponed because the Magistrate Judge found that further delay would cause serious harm to the interests of justice, namely resulting in Defendant serving more time in custody than the Defendant's potential guideline sentence. Defendant waived personal appearance on the record and consented to appearing by video conference after

1

consultation with counsel. The Magistrate Judge also confirmed that Defendant could see and hear clearly during the proceeding.

Defendant was sentenced on September 2, 2015, before the Honorable Marina Garcia Marmolejo in the Southern District of Texas, Laredo Division, after pleading guilty to conspiracy to transport, transport and attempt to transport undocumented aliens, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and 1324(a)(1)(A)(v)(II). (Dkt. No. 87). Defendant was sentenced to fifteen months' imprisonment followed by a three-year supervised release term ("TSR") subject to court-imposed conditions, including drug/alcohol treatment, mental-health treatment, vocational training, and a $100 special assessment. *Id*. Defendant's TSR began on December 6, 2016. (Dkt. No. 128).

The U.S. Probation Office ("USPO") filed a Request for Modifying the Conditions or Term of Supervision with Consent of the Offender on May 23, 2018, alleging that Defendant committed misdemeanor criminal trespass on July 13, 2017. (Dkt. No. 107). Defendant voluntarily waived her statutory right to a hearing and to assistance of counsel and agreed to home confinement, a modification of her conditions of supervised release. (Dkt. No. 107).

On July 29, 2020, Defendant filed a Motion to Reconsider Setting Bond due to various health issues. (Dkt. No. 117). The Court denied the Motion on August 7, 2020. (Dkt. No. 119).

## I.   PETITIONS

The USPO filed the instant petition on October 23, 2019, and the supplemental petition on September 30, 2020, alleging seven violations:

2

(1)   New Law Violation: Assault by threat (Grade C);

(2)   New Law Violation: Aggravated Assault with a Deadly Weapon (Grade A);

(3)   New Law Violation: Possession of a Controlled Substance (Grade B);

(4)   New Law Violation: Engaging in Organized Criminal Activity (Grade A);

(5)   New Law Violation: Aggravated Kidnapping (Grade A);

(6)   New Law Violation: Aggravated Kidnapping (Grade A); and

(7)   New Law Violation: Aggravated Assault with a Deadly Weapon (Grade A).

(Dkt. Nos. 109 and 128).  With respect to the first allegation, the first petition alleges that on January 5, 2019, a deputy from the Zapata County Sheriff's Office was dispatched to a residence in reference to a call regarding harassment.  (*See* Dkt. No. 109).  Upon arrival the deputy met with Francisco Villarreal, Defendant's husband. *Id.*  Villarreal told the deputy that Defendant and her friend picked him up and told him they were going to drive him to Alberto Jaime's residence to have him beat up. *Id.*  Villarreal asked to be let out of the vehicle but Defendant kept all doors and windows shut.  *Id.*  Villarreal managed to take the keys and turn off the vehicle from the back seat and then he exited the vehicle.  *Id.*  Deputies then spoke to Defendant who denied the claims made by Villarreal and stated that she never threatened him. Deputies instructed Defendant to leave Villarreal alone and Defendant agreed.  *Id.* Defendant was arrested for assault by threat and for driving without a license.  *Id.* Defendant was taken to the Zapata County Jail for processing.  *Id.*

3

With respect to allegations two and three, the first petition alleges that on September 13, 2019, a Sergeant from the Zapata County Sheriff's office was dispatched to a residence in reference to a call regarding a threat. (*See* Dkt. No. 109). Upon arrival, the Sergeant met with witnesses who advised Defendant was driving a Chrysler 300 vehicle along with passenger, Julia Rebecca Madrigal. The Sergeant was advised Defendant held Madrigal against her will by threatening to send her to Mexico to have her killed. *Id*. Witnesses provided the location of the Chrysler. *Id*. Upon arriving at that location, the Sergeant observed Defendant driving the Chrysler. *Id*. The Sergeant waived his flash light and attempted to have the Defendant stop. *Id*. After she failed to stop, the Sergeant initiated a traffic stop. *Id*. He observed Defendant speaking to Madrigal in the car. *Id*. After the Sergeant instructed Madrigal to exit the vehicle, Defendant stated she did not know who the passenger was, and that Madrigal was using her phone to make calls and send text messages. *Id*. The Sergeant noticed that Defendant had a Phillips head screwdriver on the driver's seat, near her crotch area. *Id*.

The Sergeant then met with Madrigal, who said that she did not want to say much because she was scared of Defendant. *Id*. Madrigal said Defendant accused madrigal of stealing from her, and wanted to send Madrigal to Mexico. *Id*. Madrigal said her elbow was injured and said she had bruises and scratches on her back. *Id*. Madrigal said Defendant hit her with a stick and tried to force the stick up her vagina. *Id*. Madrigal stated that Defendant threw the stick onto the street, and had crack cocaine on her person. *Id*.

4

The Sergeant lifted the driver's side floor mat of the Chrysler 300 and found a white, rocky substances, which tested positive for cocaine and weighed less than 0.1 grams. *Id.* An assisting Captain located the possible weapon that was used during the assault, which was later positively identified by Madrigal. *Id.* There were red stains on the stick which appeared to be blood. *Id.*

Defendant was subsequently arrested and charged with the offenses of Aggravated Assault with a Deadly Weapon, and Possession of a Controlled Substance. *Id.*

With respect to allegations four through seven, the second petition includes statements from victims Julia Rebecca Madrigal and Raquel Sanchez, and witness statements from Jorge Jasso, Claudio Trevino, Arnoldo Gonzalez, Jr., and Isela Garcilazo regarding the offense conducted dated September 13, 2019. (Dkt. No. 128).

In her statement, Julia Rebecca Madrigal stated that on September 12, 2019, Defndant offered her and Raquel Sanchez a place to stay because Madrigal's prior residence had no running water, electricity, or food. (Dkt. No. 128). The next day, Defendant told Madrigal that Defendant was going to Alice, Texas, to pick up a check. *Id.* Defendant gave madrigal and Sanchez ten crack cocaine rocks to sell. *Id.* Sanchez smoked the ten crack cocaine rocks. *Id.* Upon Defendant's return, Defendant asked for the crack or money, and Madrigal told Defendant that Sanchez smoked them. *Id.* Defendant placed phone calls and told several people to come to the residence. *Id.* Jorge Jasso, Albert Jaime, and Isela Garcilazo arrived at the residence, and joined Claudio Trevino and Arnoldo Gonzalez, Jr., who were already there. *Id.* Defendant

told Jasso and Jaime to stand by the door, so Madrigal and Sanchez couldn't leave. *Id.* Madrigal and Sanchez were sitting on the couch when Defendant and Garcilazo began beating them with a wooden stick and a metal rod. *Id.* Garcilazo struck Sanchez two times on the head and Sanchez lost consciousness. *Id.* After they were stuck several times, Defendant and Garcilazo told them to take off their clothes and perform oral sex on the males in the room. *Id.* Madrigal and Sanchez pleaded and said they didn't want to perform oral sex. *Id.* Madrigal said Defendant and Garcilazo tried to pry open the legs of Madrigal and Sanchez and shove a wooden stick in their vaginas. *Id.* Madrigal said the males never took part in the assault and Jasso told Defendant, "you need to stop, chill," in Spanish. *Id.* Madrigal said Defendant told Madrigal to call her mother and ask her to send money. *Id.* As Madrigal spoke to her mother and explained what was happening, Defendant beat Madrigal with a stick. *Id.* Madrigal's mother agreed to send her money and Defendant grabbed a screwdriver and told Madrigal and Sanchez to get into the car. *Id.* Madrigal said the color of the screwdriver was yellow and black. *Id.* As Madrigal spoke to her mother, Defendant got on the phone and said Madrigal stole money from her and that the mother need to send $200. *Id.* Madrigal said that as they drove around trying to find someone to pay the money, Defendant said she was going to drive them to Mexico to have them killed. *Id.* Defendant threatened to burn Sanchez' mother's home while she was inside if they tried to escape. *Id.* Defendant drove to Sanchez' mother's home. Sanchez exited the vehicle and told Defendant that no one was home. *Id.* Defendant became frustrated and told Sanchez that she would find her later, and was going to

take Madrigal to Mexico. *Id.* After driving away, an officer with the Zapata County Sheriff's Office drove behind them. *Id.* Defendant told Madrigal to tell the officer that they were looking for Sanchez, and she was helping her to get back to Houston. *Id.* After the traffic stop, Madrigal received assistance from the Zapata County Emergency Medical Services, however, she refused to be transported to Laredo Medical Center. *Id.*

On September 14, 2019, Defendant provided a statement. (Dkt. No. 128). She said Sanchez called her and asked Defendant to take her something to eat. *Id.* Sanchez and Madrigal had been staying at Defendant's home, where they were using illegal drugs. *Id.* Defendant said she invited Sanchez and Madrigal to the home because to prepare some food for them and let them spend the night there. *Id.* Defendant told officers that she had $100 hidden in a box of baby wipes in her room, and that Sanchez and Madrigal blamed each other for stealing the money. *Id.* Madrigal called her mother asking if she could pay the money to Defendant. *Id.* Defendant told Sanchez and Madrigal to get into the car, so she could take them to Sanchez' mother's residence. *Id.* When they arrived, Sanchez left the car. *Id.* Madrigal chose to stay in the car and wanted to pay back Defendant. *Id.* Defendant told Madrigal she could try to convince Madrigal's mother to send the money so Madrigal could return to Houston. *Id.* Defendant said she spoke with Madrigal's mother, who said she wasn't going to send any money because she had heard that Madrigal had broken into a home. *Id.* Defendant said she drove around for three hours looking for

Sanchez, and as she was about to drive home, she was pulled over by the Zapata County Sheriff's Office. *Id.* She denied hitting Madrigal or Sanchez. *Id.*

On September 16, 2019, Jorge Jasso provided a statement. (Dkt. No. 128). He said that he had received a call from the Defendant who was crying. *Id.* When he went to the residence, he saw Sanchez and Madrigal sitting on the couch, and Defendant was hitting them with a wooden stick. *Id.* He said Defendant and Garcilazo beat Sanchez and Madrigal with the stick and a fiberglass or metal rod. *Id.* Garcilazo forced Sanchez and Madrigal to take off their clothes and perform oral sex on the males. *Id.* Garcilazo put a latex glove on the wooden stick and tried to shove the stick into the females' vagina and anus. *Id.* Jasso saw Sanchez lose consciousness after being stuck with the stick. *Id.* Jasso said Defendant told him to close and lock the door so Sanchez and Madrigal couldn't leave. *Id.* Jasso said Defendant later told Sanchez and Madrigal to put their clothes on and get into the car. *Id.* Jasso then left the scene, however Defendant contacted him and asked if she could borrow his phone so that Madrigal could call someone to pay money. *Id.* When he arrived, he saw a black and yellow screwdriver between Defendant's legs in the car. *Id.*

On September 16, 2019, Claudio Trevino provided a statement. (Dkt. No. 128). He said when he arrived at the residence, he saw Defendant accusing Sanchez and Madrigal of stealing crack cocaine from her. *Id.* He saw Defendant and Garcilazo hitting Madrigal and Sanchez with a metal rod and a wooden stick. *Id.* They took turns hitting each woman several times in the head. *Id.* Trevino saw Defendant's daughter crying as she watched her mother hitting Sanchez and Madrigal. *Id.* After

being hit, one of the females lost consciousness, and Jasso caught her in his arms. *Id.* Jasso tried to leave, but Defendant told him to stay and close the door. *Id.* Trevino said Defendant attempted to rape Sanchez and Madrigal with a stick. *Id.* Garcilazo told Sanchez and Madrigal to perform oral sex on the males. *Id.* Trevino said the males didn't want to get involved. *Id.* Trevino said Defendant threatened everyone present to keep their mouths shut, otherwise someone named Calaca would take them to Mexico. *Id.* Defendant then told Sanchez and Madrigal to get dressed and go into the car. *Id.*

On September 16, 2019, Arnoldo Gonzalez, Jr. provided a statement. (Dkt. No. 128). He said that when he arrived as the residence, Defendant accused Sanchez and Madrigal of stealing crack cocaine from her. *Id.* Gonzalez said Defendant and Garcilazo assaulted Sanchez and Madrigal with a wooden stick, and instructed them to take off their clothes. *Id.* He said that Defendant tried to scare Sanchez and Madrigal into thinking that they would be raped with a stick. *Id.* He said Sanchez and Madrigal refused to perform oral sex on the males. *Id.*

On September 20, 2019, Raquel Sanchez provided a statement. (Dkt. No. 128). She said that on September 13, 2019, Defendant gave Sanchez and Madrigal a hit of crack cocaine to clean Defendant's home. *Id.* Defendant gave Sanchez ten hits of crack cocaine to sell from the residence. *Id.* Defendant then left the residence. Sanchez and Madrigal smoked all of the crack cocaine. *Id.* When Defendant arrived back at the home, Sanchez said that they had smoked the crack cocaine, and that Sanchez could get Defendant her money. *Id.* Defendant began to hit her and Madrigal with a

wooden stick on their bodies and heads. *Id.* Garcilazo told Sanchez and Madrigal to take off their clothes. *Id.* Garcilazo took a photo or video of them while nude. *Id.* Garcilazo put a glove on the stick and told them to bend over. *Id.* Garcilazo hit Madrigal's inner thighs, so she would spread her legs open. *Id.* Defendant told Madrigal to call her mother to ask for money. *Id.* Defendant hit them while Madrigal was on the phone. *Id.* Defendant spoke with Madrigal's mother and said Madrigal and Sanchez broke into her home and stole $200. *Id.* Madrigal's mother agreed to pay Defendant. *Id.* No one wanted to provide Madrigal's mother with a name to write on a money order. *Id.* Defendant had a yellow and black screwdriver with her, and told Sanchez and Madrigal that she would stab them if they tried anything. *Id.* Sanchez told Defendant to go to Sanchez' mother's home. *Id.* At the home, Sanchez exited the car, and learned her mother wasn't home. *Id.* During this time, Madrigal left the vehicle to speak with a neighbor, but then went back to the vehicle. *Id.* Defendant told Sanchez and Madrigal that if they didn't get the money in ten minutes, that Defendant would take them to Mexico, to meet someone named Calaca. *Id.* Sanchez said a neighbor heard Defendant threatening Sanchez, and called the Sheriff's Office. Sanchez then hid in the backyard. *Id.*

On October 1, 2019, Isela Garcilazo provided a statement. (Dkt. No. 128). She said that when she arrived at the residence, she saw Sanchez and Madrigal sitting on the couch. *Id.* She went to the home to buy crack cocaine from Defendant. *Id.* Garcilazo said she saw Defendant hitting Sanchez and Madrigal with a metal pipe. *Id.* She helped Defendant hit them with a wooden stick. *Id.* Garcilazo said she told

Sanchez and Madrigal that she was going to rape them with a wooden stick with a latex glove on it. *Id.* She said that she hit the women because she thought Defendant would pay her in crack cocaine. *Id.* She said that she beat Sanchez and Madrigal for five minutes. Garcilazo saw Defendant put Sanchez and Madrigal in her vehicle. *Id.*

## II.   REVOCATION HEARING

At the revocation hearing held on December 14, 2020, Defendant pleaded not true to all seven allegations.  (Hrg. at 9:18).  The Government then presented their first witness, Julia Madrigal.  (Hrg. at 9:20).

Madrigal testified that on September 12, 2019, Defendant offered to take Sanchez and Madrigal to Defendant's home. (Hrg. at 9:24). Defendant gave Madrigal food, clothes, an opportunity to shower, and a place to sleep. (Hrg. at 9:24-25). The next morning, on September 13, 2019, Defendant told Sanchez and Madrigal that she had to leave to go to another city, and told Sanchez and Madrigal to clean her home while Defendant was away. (Hrg. at 9:25). Defendant gave Madrigal ten bags of crack cocaine, and asked Madrigal to sell the bags to anyone who wanted them. (Hrg. at 9:26). Defendant then left the residence. (Hrg. at 9:26). Madrigal and Sanchez then smoked the crack cocaine. (Hrg. at 9:26). Defendant returned to the residence approximately five hours later. (Hrg. at 9:26). When Madrigal told Defendant that the crack cocaine had been smoked, Defendant became upset, and Madrigal offered to pay Defendant $80 as compensation. (Hrg. at 9:26-27). Defendant then placed a phone call and asked people to come to the residence. (Hrg. at 9:27). After Defendant called another women to come get Defendant's daughter, Isela Garcilazo arrived at

the residence. (Hrg. at 9:27). Defendant began hitting Sanchez and Madrigal with a wooden stick, resembling a broom stick. (Hrg. at 9:28-29). Madrigal was hit on her shoulder, side, leg, stomach, and head. (Hrg. at 9:29). Sanchez lost consciousness after being hit on her head. (Hrg. at 9:29). When Garcilazo arrived, Garcilazo took the wooden stick and began hitting Sanchez and Madrigal. (Hrg. at 9:28). Garcilazo told Sanchez and Madrigal to take off their clothes. (Hrg. at 9:28). After telling Sanchez and Madrigal to take off their clothes, Garcilazo took a photo of them. (Hrg. at 9:31). Garcilazo tried to part Madrigal's legs with the stick in order to penetrate her. (Hrg. at 9:31). During this time, Defendant was hitting Sanchez with a metal pole. (Hrg. at 9:32).

Defendant then told Madrigal to call her mother in order to get $200. (Hrg. at 9:33). Madrigal called her mother. (Hrg. at 9:33). During the phone call, Madrigal began screaming, and Defendant hit Madrigal with the stick. (Hrg. at 9:34). During a second phone call, Madrigal's mother agreed to pay Defendant. (Hrg. at 9:34). Defendant went into the kitchen to get a knife, but a male in the home told Defendant to stop. (Hrg. at 9:34). Defendant then grabbed a yellow screwdriver and told Sanchez and Madrigal to get into the car so "Calaca" (a Spanish-language term meaning a figure of a skull or skeleton representing death) in Mexico would take care of them. (Hrg. at 9:35-36). Once Sanchez and Madrigal were in the car, Madrigal's mother stopped answering phone calls. (Hrg. at 9:36). Sanchez told Defendant that if Defendant drove to Sanchez' mother's home, that Sanchez' mother would pay the Defendant. (Hrg. at 9:37). Defendant drove Sanchez and Madrigal to Sanchez'

mother's home, but she wasn't home. (Hrg. at 9:37). When Sanchez realized her mother wasn't home, she went to a neighbor's home to ask for help. (Hrg. at 9:37-38). Neighbors hid Sanchez behind her mother's home. (Hrg. at 9:38). Defendant told Sanchez that she had better come back, or else Defendant would burn down the house with Sanchez' mother in it. (Hrg. at 9:40). Defendant became upset and then drove away with Madrigal in the back seat of the car. (Hrg. at 9:38). While in the car, Madrigal believed she was going to die, because Defendant told her that she was going to take her to "the other side," meaning Mexico. (Hrg. at 9:39). Defendant couldn't leave the car because the child locks in the back seat were activated. (Hrg. at 9:40). Neighbors near Sanchez' mother's home called the police. (Hrg. at 9:40). When Defendant saw the Sheriff's flash his light at her to get her to stop driving, Defendant began speeding away. (Hrg. at 9:41). The Sheriff then got back into his patrol vehicle. (Hrg. at 9:41). Defendant told Madrigal to get into the front seat of the car and throw the wooden stick out the window. (Hrg. at 9:41). Madrigal complied with both instructions. (Hrg. at 9:41). After the Sheriff caught up to Defendant's car, Defendant told Madrigal to say that Defendant had picked up Madrigal because Sanchez had beaten Madrigal severely. (Hrg. at 9:42).

Madrigal got into the Sheriff's vehicle and they located the wooden stick that Madrigal had thrown out to the window. (Hrg. at 9:43). Madrigal went to visit a doctor in Houston in order to treat her injuries. (Hrg. at 10:02). She was informed that she had suffered a concussion, had bruising on her backs, legs, arms, and a hematoma on

her arm. (Hrg. at 10:07). Her injuries were inflicted by the wooden stick, not by the metal rod or the screwdriver. (Hrg. at 10:07-08).

The Government then presented their second witness, Sergeant Andrew Trevino, from the Zapata County Sheriff's Office. (Hrg. at 10:15).

Trevino testified that he responded to a location after dispatch informed him that a witness overheard threats made against a female. (Hrg. at 10:16). Trevino saw Defendant pass by him in a Chrysler 300. (Hrg. at 10:16). Trevino performed a traffic stop on the vehicle. (Hrg. at 10:17). Trevino saw that Defendant and Madrigal were having a conversation, and believed Defendant was trying to get Madrigal to agree to something. (Hrg. at 10:18). After making contact with Defendant, Defendant tried to distract Trevino by showing Trevino her phone and claiming innocence even though Trevino hadn't accused her of doing anything wrong. (Hrg. at 10:20). Madrigal wasn't moving her left arm, even when other parts of her body moved, which appeared abnormal. (Hrg. at 10:20-21). Trevino believed Madrigal was scared. (Hrg. at 10:22). Trevino saw a yellow and black screwdriver between Defendant's legs. (Hrg. at 10:22). Madrigal was asked to leave the car, and Trevino believed Madrigal was terrified. (Hrg. at 10:23). Madrigal told Trevino that Defendant assaulted her with a stick or bat and had threatened Madrigal. (Hrg. at 10:23-25). Trevino saw bruises on Madrigal. (Hrg. at 10:25).

Trevino searched under the driver's side floor mat of the Chrysler 300, and found a white rocky substance consistent with the appearance of crack cocaine. (Hrg.

at 10:26). The substance field-tested positive for the characteristics of cocaine. (Hrg. at 10:26). Trevino could not recall who the vehicle was registered to. (Hrg. at 10:28).

Trevino traveled to the location where Madrigal indicated she had thrown the wooden stick out of the car, and took photos of the stick. (Hrg. at 10:27-28, Dkt. No. 143 Ex. 4-5). Trevino took a photo of Madrigal's back. (Hrg. at 10:29, Dkt. No. 143 Ex. 2). Trevino took a photo of Madrigal's leg. (Hrg. at 10:29, Dkt. No. 143 Ex. 3). An ambulance arrived on scene, and Madrigal was attended to by an Emergency Medical Services technician. (Hrg. at 10:46).

The Government then presented their third witness, Sergeant Investigator Adrian Lopez, from the Zapata County Sheriff's Office. (Hrg. at 10:50).

Lopez testified that he interviewed Isela Garcilazo and received consent to search her phone. (Hrg. at 10:52). A photo was obtained from her phone depicting Madrigal and Sanchez standing, while nude, in a residence. (Hrg. at 10:52, Dkt. No. 143 Ex. 1). Lopez said that during Garzilazo's interview, she stated that she and Defendant had beaten Madrigal and Sanchez with sticks due to owed drug money. (Hrg. at 10:54).

Defendant objected to Exhibit 4 on the basis that there wasn't a street name in the photo or any other indication as to where the wooden stick was found.  (Hrg. at 10:30-31). Trevino explained he took the photo of the stick, and stated the location where he took the photo. (Hrg. at 10:31). The Defendant's objection was overruled. (Hrg. at 10:32). Defendant objected to Exhibit 2 on the basis that it wasn't clear whose

body was in the photo. (Hrg. at 10:33). Trevino then explained that he took the photo of Madrigal. (Hrg. at 10:32). Defendant's objection was overruled. (Hrg. at 10:33).

Exhibits 1-5 were admitted into evidence.

Based on the testimony provided, the Undersigned found that the Government proved Violations Two through Seven by a preponderance of the evidence. (Hrg. at 11:36). The Government did not present evidence regarding Violation One (Assault by Threat – Misdemeanor), which is a Grade C violation. The Undersigned further found that Defendant violated her supervised release. For a Grade A violation the guideline range is between twelve and eighteen months' imprisonment, and for a Grade B violation the guideline range is between four and ten months' imprisonment (Defendant has a Category I criminal history). U.S.S.G. § 7B1.4.

In crafting the appropriate revocation sentence, a court may impose (1) a sentence within the guidelines range, (2) "an upward or downward departure as allowed by the Guidelines," and (3) "a non-Guideline sentence or a variance that is outside of the relevant Guidelines range." *United States v. Brantley*, 537 F.3d 347, 349 (5th Cir. 2008) (internal quotation marks and citation omitted). A court may impose any sentence that falls within the statutory maximum term of imprisonment allowed for the revocation sentence, 18 U.S.C. § 3583(e)(3), and a court must consider the permissible factors enumerated in 18 U.S.C. § 3553(a), along with the nonbinding policy statements found in Chapter Seven of the Sentencing Guidelines. *United States v. Walker*, 742 F.3d 614, 616 (5th Cir. 2014). The permissible § 3553 factors include: the defendant's criminal history and characteristics; the need for adequate

deterrence; the need for protection of the public; the need for effective care, training, or treatment; the kinds of sentence and sentencing range established for the defendant's applicable category of offense; the pertinent Sentencing Commission policy statements; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to any victims. *See* 18 U.S.C. § 3583(e). The Court is considering only the allowable § 3553 factors, and to the extend the Court has looked at the seriousness of the allegation/s, it has done so not as a primary consideration, but a secondary one. *See United States v. Rivera*, 784 F.3d 1012, 1016–17 (5th Cir. 2015). The primary sentencing goal upon revocation of supervised release is to sanction the defendant for failing to abide by the terms of the supervision. *See* U.S.S.G. Ch. 7, Pt. A, intro. comment ¶ 3(b); *United States v. Miller*, 634 F.3d 841, 843 (5th Cir. 2011).

Here, the U.S. Probation Office recommended a punishment of imprisonment within the guideline range, at least one year of supervised released, and special conditions that include substance-abuse treatment, mental-health treatment, vocational training, and six months of home confinement. (Hrg. at 11:37-39). The Government recommended the maximum term of imprisonment allowed, which is 2 years. (Hrg. at 11:44).

Defendant requested the Court consider the Defendant's current medical issues and remove the vocational training special condition. (Hrg. at 11:46-50). Defendant further requested the Court consider the length of time that Defendant has already been in custody when sentencing her. (Hrg. at 11:46-50). Defendant

entered state custody on September 13, 2019, and federal custody on December 19, 2019. (Hrg. at 11:42). Defendant completed an anger management course while in the facility. (Hrg. at 11:53).

The Undersigned advised he would recommend that Defendant's TSR be revoked, and that he be sentenced within the guidelines range to eighteen months' imprisonment, to be served concurrently for all violations, with credit for time served in federal custody, with one year of supervised release afterwards, and with the special condition of six-months of home confinement that shall begin when Defendant is released from prison.[1] (Hrg. at 11:57-59)

## III.   RECOMMENDATIONS

It is **RECOMMENDED** that the District Court **ACCEPT** the Undersigned's finding that Defendant committed Violations Two through Seven in the petition thereby violating her term of supervised release.  (Dkt. Nos. 109 and 128).

It is further **RECOMMENDED** that Defendant's term of supervised release be **REVOKED**.

It is further **RECOMMENDED** that Defendant be sentenced to eighteen months' imprisonment, to be served concurrently for all violations, with credit for time served in federal custody, with one year of supervised release afterwards, and

---

[1] "A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences. . . that has not been credited against another sentence."  18 U.S.C. § 3585(b).  Furthermore, the Advisory Guidelines recommend that the term of imprisonment shall be served consecutively to any sentence of imprisonment that the Defendant is currently serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of supervised release.  *See* U.S.S.G. § 7B1.3(f).

with the special condition of six-months of home confinement that shall begin when Defendant is released from prison.

It is further **RECOMMENDED** that the previously imposed special conditions that Defendant participate in substance abuse treatment, testing, and abstinence programs be reinstated.

It is further **RECOMMENDED** that the previously imposed special condition that Defendant participate in a mental health treatment program be reinstated.

It is further **RECOMMENDED** that the previously imposed special condition that Defendant be required to participate in a vocational training program be reinstated.

At the close of the December 14, 2020, revocation hearing, Defendant, defense counsel, and counsel for the Government orally waived their right to object to the proposed findings and recommendations contained in this Report, consenting to revocation of supervised release as recommended herein, and consenting to the imposition of the above sentence recommended in this Report.  (Hrg. at 12:07-08). Defendant also waived the right to be present and speak before the District Judge when she imposes the recommended sentence.  (Hrg. At 12:08-09).  Therefore, the District Court may act on this Report immediately.

SIGNED this 29th day of December 2020.

CHRISTOPHER DOS SANTOS
UNITED STATES MAGISTRATE JUDGE